IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


AMY KRUPP,                          )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )          No. 11 C 6707
                                    )
LIBERTY LIFE ASSURANCE COMPANY      )
OF BOSTON,                          )
                                    )
            Defendant.              )


## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Amy Krupp filed suit against Liberty Life Assurance Company of Boston pursuant

to section 502(a)(1)(B) of the Employee Retirement Income Security Act, 29 U.S.C. §

1132 (ERISA), seeking recovery of long-term disability benefits and a declaratory

judgment that she is entitled to ongoing benefits.  Krupp and Liberty Life have filed

cross-motions for summary judgment.  For the reasons stated below, the Court grants

Krupp's motion for summary judgment, denies Liberty Life's motion for summary

judgment, and remands the case to the plan administrator.

### Background

Krupp worked as a design director for McGraw-Hill Companies, Inc. from

September 2002 through November 2008.  Through this employment, she participated

in a group long-term disability insurance plan underwritten and administered by Liberty

Life.

Before and throughout her employment at McGraw-Hill, Krupp experienced a

variety of medical problems.  She began experiencing severe back and neck pain and headaches in 2001.  Her symptoms persisted, and in June 2002, she underwent a posterior cervical decompression and laminectomy from C6 to T1.  In September 2003, Krupp underwent a Chiari malformation repair and decompression.  These surgeries provided little relief, and her symptoms soon returned.  In February 2006, after conducting another exam and reviewing her MRI scans dating back several years, Krupp's treating neurosurgeon Dr. Dan Heffez confirmed Krupp's diagnosis of cervical stenosis and myelopathy at C4-5, C5-6, and C6-7, and he concluded that she needed to undergo a third operation.  On March 16, 2006, Krupp underwent another posterior cervical decompression and laminectomy from C3 to T1.

Krupp's third surgery did not resolve her medical problems.  X-rays taken of her cervical spine throughout 2006 and 2007 revealed anterolisthesis of C3 and C4.  Dr. Heffez further documented in 2007 that Krupp continued experiencing pain at the back of her head, burning down her spine, muscle spasms, tightness, dizziness, nausea, constant weakness, decreased range of neck motion, and shortness of breath.  Krupp also found it difficult "to open things such as paper clamps."  According to Liberty Life's records, Dr. Heffez told Krupp that her "myelopathy cannot be erased completely" and that it "is a chronic condition."  Admin. R. at LM660-61.

Because Krupp's pain persisted, she sought the care of pain specialist Dr. Ira Goodman.  Between September 2007 and May 2008, Dr. Goodman treated Krupp for both neck and lower back pain and radiculopathy, in addition to diagnoses of complex regional pain syndrome and meralgia paresthetica.  Krupp's reported pain intensity, on a scale of ten, ranged from nine to ten at its worst and five to eight on average.  Her

total disability score ranged from thirty-nine to fifty-three on a scale of one hundred, signifying severe disability due to pain. In an attempt to manage her pain, Krupp was prescribed a variety of powerful drugs, including Vicodin, Flexeril, Lidoderm, Neurontin, Cymbalta, Opana, and fentanyl. She also received four right lumbar paravertebral sympathetic nerve blocks.

In 2008, an MRI of Krupp's cervical spine revealed postsurgical changes and hemangiomas at C4. Other tests performed at the request of Dr. Heffez revealed a slowing of nerve impulses within the central somatosensory pathway to the upper and lower extremity and within the brainstem auditory pathway. Thus on August 2, 2008, Krupp underwent her fourth surgery, consisting of a re-exploration and inspection of her spinal fusion, C2 decompression and laminectomy, and revision of the C3 instrumentation.

Krupp ceased working on November 17, 2008 and applied for short-term disability benefits under the disability insurance plan. Liberty Life approved her claim and paid her benefits beginning November 24, 2008. During this time, Krupp was re-evaluated by Dr. Benjamin Nager, her neurologist since 2001. On November 28, 2008, Dr. Nager noted that Krupp was experiencing numbness of the head, face, gums, tongue, legs, and thighs, with symptoms being worse on the right side of her body. He also stated that she was having trouble speaking, bowel and bladder dysfunction characterized by diarrhea and frequent urination with occasional urinary incontinence, frequent dizzy spells, difficulty walking, vomiting as a result of increased movement, and general weakness. Dr. Nager noted that Krupp displayed "a Babinski sign on the left side," that her gait was unsteady, and that she suffered from a loss of sensation. *Id.* at

LM1165. He also wrote that Krupp was "not doing well," and that he told her that he "would like to just start over." *Id.*

That same day, upon Dr. Nager's recommendation, Krupp underwent MRI scans of her brain, cervical spine, and thoracic spine. The brain scan revealed two minute foci of altered signal in the white matter deep in the right frontal lobe that were nonspecific and likely small foci of gliosis. The spinal scans revealed hemangiomas at C4, T4, T8, and T10. At a follow-up visit on December 5, 2008, Dr. Nager reported, "At this point in time, my opinion is that [Krupp] has chronic pain and paresthesias which are not likely to be remedied by any additional surgical intervention." *Id.* at LM1257-58. Dr. Heffez confirmed this diagnosis on December 9, 2008, also taking notice of Krupp's increasing weakness in her upper and lower extremities, numbness on the right side of her body, urinary retention issues, and a decreased range of motion in her cervical spine due to pain.

Dr. Goodman also noted that Krupp's symptoms were worsening. On January 2, 2009, Dr. Goodman reported that Krupp's total disability score had increased to eighty-two out of one hundred. Nevertheless, Krupp attempted to return to work on January 6, 2009, but she experienced pain, numbness, and nausea while there and was unable to return to work the next day. She ceased working again as of January 7, 2009, was placed back on short-term disability, and transitioned to long-term disability on May 20, 2009.

Krupp continued seeing Dr. Nager, who on January 13, 2009 reported that Krupp was still experiencing total body numbness, severe headaches, cervical pain, and stiffness. He also noted that Krupp stated that she felt confused and foggy at times and

that her symptoms interfered with her sleep. Krupp cried intermittently during the evaluation, which Dr. Nager believed indicated underlying depression. He referred Krupp to a psychiatrist for a consultation.

The next day, on January 14, 2009, Dr. Nager completed an "attending physician's assessment of capacity" for Krupp at the request of Liberty Life. In the form, Dr. Nager identified Krupp's diagnoses as "Chiari, myelopathy, migraine, [and] muscle spasm." *Id.* at LM688. Dr. Nager reported in the "physical capacity" portion of the assessment that Krupp was capable of sitting up to five and a half hours per day for forty minutes at a time. He stated, however, that Krupp was capable of only "occasional" (up to two and a half hours per day) standing, walking, driving, climbing, squatting, bending, kneeling, light grasping, fingering/typing, and reaching below shoulders. She could never push/pull, forcefully grasp, reach overhead, or lift any weight. When asked if Krupp was capable of functioning in an occupational setting full time within the capacities noted, Dr. Nager answered "no" and further noted that the restrictions imposed would last a "lifetime." *Id.* Dr. Nager verified that his assessment of Krupp's capacity was based upon his clinical experience, specialty training, diagnostic tests, patient self-reports, his direct observation, and his clinical examinations of Krupp.

Krupp received second opinions and saw other physicians in an effort to treat her symptoms. On January 30, 2009, Krupp saw neurosurgeon Dr. Jonathan Citow, who upon physical examination noted that Krupp's neck and back were tender with limited range of motion. Between March 9, 2009 and December 13, 2010, Dr. Aslam Zahir, a hematologist, treated Krupp for iron deficit anemia, vitamin B-12 deficiency, and severe

pain.  Krupp was also examined at the Mayo Clinic in Minnesota in May and June 2009.

She was diagnosed with small fiber peripheral neuropathy, urinary urgency and

frequency, seborrheic keratosis, and dermatofibroma of the left forearm.  On June 30,

2009, Krupp's peripheral neuropathy was confirmed following a left sural nerve biopsy.

On August 7, 2009, Dr. Goodman reported that Krupp's pain had increased

overall by approximately thirty percent.  He instructed Krupp to undergo another nerve

block and to start taking OxyContin and Norco, two narcotic pain drugs.

That same month, Liberty Life began investigating Krupp's claims.  It first hired

neurologist Dr. Joseph Jares to perform an external review of her claim file.  Dr. Jares

drafted a report outlining various physical limitations, which was then forwarded to

vocational expert Dan Careau, Ph.D., C.R.C.  On August 14, 2009, after researching

the physical demands of Krupp's occupation as a design director and studying the

physical limitations detailed in Dr. Jares's report, Careau classified Krupp's job as

involving a "sedentary" level of exertion and concluded that she could not return to her

occupation because, according to Dr. Jares, she was unable to perform frequent fine

hand or finger movements, both of which her job required.

Liberty Life also asked Krupp to complete an activities questionnaire.  In the

questionnaire, Krupp stated, among other things, that she could sit for only fifteen

minutes at a time, stand for only five minutes at a time, and walk for only three minutes

at a time.  Krupp noted that she took two to three naps per day and that she left her

house once per week.  She further explained that she did not drive, use the computer,

travel, or exercise, and that she could not perform, or required assistance with, nearly

all daily household tasks and chores, including grocery shopping, cooking, and

cleaning.

In an effort to verify Krupp's claims, Liberty Life performed four days of covert surveillance on her in February 2010. According to the surveillance report, Krupp did not leave her house the first three days. On the fourth day, she remained indoors with the exception of when she drove her car for a total of just eight minutes to pick up her daughter from school. Between April and May 2010, Liberty Life again surveilled Krupp for five more days based on its suspicion that her limitations seemed "excessive" and "exaggerated." *Id.* at LM440. Liberty Life obtained only twenty-six seconds of surveillance footage, during which Krupp was seen coming out of her home to check her mailbox.

In May and June 2010, Krupp's file was referred to Dr. David Carnow for another file review. In his report, Dr. Carnow acknowledged Krupp's history of cervical spine disease, multiple spine surgeries, and myelopathy. He also observed that doctors at Mayo Clinic diagnosed Krupp as having small fiber peripheral neuropathy, and he noted that he had watched the surveillance footage of Krupp walking to her mailbox. Dr. Carnow also stated that as part of his review, he had spoken with Dr. Goodman and Dr. Zahir, but not with Dr. Nager. He noted that Dr. Goodman stated that although he was treating Krupp for neuropathic leg pain, he could not provide an opinion on "her current functional status" because he had not seen her since August 2009. Dr. Zahir, who was treating Krupp for both hematologic conditions and pain, explained that although she was not impaired by any hematologic condition, she "was impaired by upper torso and extremity pain." *Id.* at LM402. Dr. Carnow concluded that although the medical evidence supported Krupp's diagnosis of cervical spinal stenosis and iron deficient

anemia, it did not support an inability to work an eight-hour work day at the sedentary level.

On October 11, 2010, Liberty Life sent Krupp to Dr. Christopher Pasquale for an independent medical evaluation (IME). During his forty-five minute examination, Dr. Pasquale found that Krupp had a limited cervical range of motion, and he confirmed her treating physicians' diagnoses. He concluded, however, that Krupp's reports of pain, paresthesias, fatigue, and inability to stay out of bed were "subjective," given that Krupp "did demonstrate the ability to sit throughout the evaluation, stand and walk upon entering and leaving the facility." *Id.* at LM349. Based on his review of her medical file and his examination, Dr. Pasquale concluded that Krupp was capable of sedentary work, provided that her lifting and carrying was restricted to ten pounds, she only occasionally used a firm grasp or reached above her shoulders, and she changed her position when sitting once every hour for five minutes. On November 5, 2010, Dr. Nager – who received a copy of the IME – sent Liberty Life a rebuttal letter disagreeing with Dr. Pasquale's assessment and stating that he did not believe Krupp was able to perform even sedentary work.

Around the same time it was investigating her long-term disability claim, Liberty Life referred Krupp to a lawyer to assist her in obtaining Social Security disability benefits. The lawyer was successful, and on November 24, 2010, an administrative law judge (ALJ) issued a fully favorable decision finding that Krupp was totally disabled as of November 15, 2008. Liberty Life's disability insurance policy, however, mandates a reduction of long-term disability benefits by the amount of any Social Security benefits received by the claimant and her dependents. Because of the award, Liberty Life

demanded reimbursement from Krupp of $54,129.67, representing the amount of Social Security disability benefits received by both Krupp and her children.

On November 8, 2010, while Krupp's Social Security disability case was pending before the ALJ, Liberty Life terminated her long-term disability benefits. The termination letter summarized the reports of Dr. Carnow and Dr. Pasquale and stated that because those reviews had demonstrated that Krupp was capable of sedentary work, she no longer met the definition of "disabled" under the plan. The letter told Krupp that she could appeal the decision by providing office notes from Dr. Nager or Dr. Zahir, test results, x-ray or MRI results, hospital records, or anything else that she believed would support her claim.

Krupp appealed Liberty Life's termination of her long-term disability on March 14, 2011. In conjunction with her letter of appeal, Krupp submitted additional treatment notes from Dr. Zahir and Dr. Nager; sworn statements from her family, friends, and colleagues attesting to her limited capacity to perform daily activities and her inability to work; and a copy of the Social Security Administration's award of disability benefits effective November 15, 2008.

On May 10, 2011, Dr. Judith Willis performed a third file review of Krupp's records on behalf of Liberty Life. Dr. Willis determined that Krupp's medical history supported even fewer restrictions on her ability to work than Dr. Pasquale had found. Dr. Willis concluded that Krupp had the ability to sustain sedentary work so long as she only occasionally lifted items up to twenty pounds and did not frequently reach above her shoulders. She found no restrictions necessary with respect to sitting or grasping.

The next day, on May 11, 2011, Liberty Life reaffirmed its termination of Krupp's

long-term disability benefits.  Its letter stated that the medical documentation in Krupp's file did not support the conclusion that "she would be precluded from performing the material and substantial duties of her own occupation on a full time basis."  *Id.* at LM102.  In support of this finding, Liberty Life again reiterated the opinions of Dr. Carnow and Dr. Pasquale and also summarized Dr. Willis's conclusions.  The letter acknowledged Krupp's award of Social Security disability benefits but stated that the "Social Security Administration (SSA) approves benefits based on their qualifications."

### Discussion

On cross-motions for summary judgment, each movant must satisfy the requirements of Federal Rule of Civil Procedure 56.  *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).  Summary judgment is proper when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)).

A denial of insurance benefits is reviewed *de novo* under ERISA "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Where the plan gives the administrator discretionary authority, a court applies an "arbitrary and capricious" standard of review.  *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007).  The parties agree that the plan at issue here provides such discretionary authority.  Thus the arbitrary and capricious standard applies.

The Court's review under the arbitrary and capricious standard is deferential. The question is not whether the Court would have reached the same decision as the administrator. *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) ("Questions of judgment are left to the plan administrator, and it is not [the court's] function to decide whether [the court] would reach the same conclusion as the administrator.") (internal quotation marks omitted); *see also Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006) ("[U]nder an arbitrary and capricious review, neither this Court, nor the district court, will attempt to make a determination between competing expert opinions."). Nevertheless, review under this standard "is not a euphemism for a rubber-stamp." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009). That said, however, a plan administrator's decision will be upheld only if "specific reasons for the denial are communicated to the claimant and supported by record evidence." *Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 449 (7th Cir. 2009). Further, the Court must "remain cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (internal quotation marks omitted). The presence of such a conflict, which exists in this case, will "act as a tiebreaker when [ ] other factors are closely balanced." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

Krupp asserts that Liberty Life's long-term appeal determination was arbitrary and capricious. She argues that Liberty Life failed to sufficiently explain its determination and did not consider the totality of her medical condition, including the

effects of her chronic pain. Krupp also contends that Liberty Life failed to take into account her Social Security disability award and operated under a conflict of interest. The Court addresses these arguments below.

## I.    The substantive merits of Krupp's claim

### a.    Sufficiency of explanation and consideration of medical evidence

Krupp argues that Liberty Life lacked a reasoned basis for denying her claim for long-term disability benefits. ERISA requires employee benefit plans that deny disability benefits to "set [ ] forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133. "Bare conclusions are not a rationale." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693 (7th Cir. 1992). In making claim determinations, the plan administrator must provide a reasoned explanation for its determination, must address any reliable, contrary evidence presented by the claimant, and may not simply ignore or dismiss without explanation treating physicians' medical conclusions. *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.").

In this case, neither the initial termination letter nor the subsequent letter denying Krupp's appeal adequately explained why Liberty Life was discrediting Krupp's treating physicians' conclusions or ignoring or rejecting evidence that was contrary to its determination that Krupp did not qualify for disability benefits. For instance, Dr. Nager – Krupp's neurologist and primary treating physician – provided, among other evidence of disability, an "attending physician's assessment of capacity." In this assessment, which

Dr. Nager conducted at Liberty's request, Dr. Nager detailed Krupp's lifelong functional limitations and concluded that Krupp was unable to function in an occupational setting based on diagnostic tests and clinical evaluations. Liberty Life ignored this evidence. In its initial termination letter, Liberty Life did not even mention Dr. Nager's assessment, and it dismissed Dr. Nager's opinion simply by citing the fact that he had not responded to Dr. Carnow's attempts to contact him. Because Dr. Nager's written assessment spoke directly to whether Krupp was disabled, Liberty Life's failure even to address it suggests arbitrary and capricious decision-making. *See Majeski*, 590 F.3d at 483 ("[A] plan administrator's procedures are not reasonable if its determination ignores, without explanation, substantial evidence that the claimant has submitted that addresses *what the plan itself has defined as the ultimate issue*.") (emphasis added).

Liberty Life also arbitrarily refused to credit Dr. Nager's letter in which he stated that he disagreed with Dr. Pasquale's IME report and that Krupp's severe pain due to her medical condition made it impossible for her to perform even sedentary work. Although Liberty Life acknowledged Dr. Nager's letter in both its initial termination letter and its letter denying Krupp's appeal, it unreasonably dismissed the letter's import by stating that Dr. Nager "did not submit any additional medical records or treatment notes to support his position [in his letter]." Admin. R. at LM100. It is true that a treating physician's unexplained or unsupported conclusions are insufficient to prove disability. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 323 (7th Cir. 2007) (administrator's decision denying benefits was not arbitrary and capricious where claimant's treating physician offered only unexplained conclusions that claimant could perform only low-stress jobs and could not lift anything over ten pounds). However, Dr. Nager's

determinations were anything but unsupported. To the contrary, Liberty Life requested and received medical records and opinions from Dr. Nager on eight separate occasions between December 2008 and August 2010. Among these submissions was Dr. Nager's attending physician's assessment of capacity, in which, as discussed above, Dr. Nager noted that Krupp's physical restrictions would last a lifetime and that she could not function in an occupational setting given her uncontrolled pain and minimal physical capabilities. These conclusions, Dr. Nager noted, were supported by diagnostic tests and clinical evaluations. Thus Liberty Life's argument that it reasonably discredited Dr. Nager's letter because it was "conclusory" does not carry the day.

The circumstances surrounding Liberty Life's request for a response to Dr. Pasquale's IME further support a finding that its decision was arbitrary and capricious. On October 26, 2010, Liberty Life sent a copy of the IME to Krupp's treating physicians and imposed a deadline for responses by November 5, 2010 – only eleven days later. Because Dr. Nager only received the IME and no explanatory cover letter, he simply placed the report in Krupp's medical file. By the time Liberty Life re-sent its October 26, 2010 letter, it was November 4, 2010. Dr. Nager requested an extension of time to submit a response, but Liberty Life refused. This sort of borderline adversarial behavior on the part of Liberty Life is contrary to its fiduciary duty to act in the interest of plan participants and is further evidence supporting a finding that the plan's determination was arbitrary and capricious. *See* 29 U.S.C. § 1104(a)(1); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. at 115 (ERISA imposes "higher-than-marketplace" standards on insurers and requires administrators to discharge their duties with respect to discretionary claims processing solely in the interests of the participants and beneficiaries (internal quotation

marks omitted)).

Not only did Liberty Life ignore the opinions of Krupp's treating physicians, but it also ignored contrary opinions rendered by its own external reviewers. In July 2009, Liberty Life sent Krupp's file to Dr. Jares, who opined that Krupp could sit for up to eight hours a day with hourly breaks but could only occasionally perform fine hand and finger movements on her right side. Based on the physical limitations and restrictions described in Dr. Jares' report, occupational analyst Dan Careau concluded that Krupp was incapable of returning to her job as a design director. In its letter denying Krupp's appeal, however, Liberty Life failed to discuss this conclusion, noting only the premise of Careau's findings: that Krupp's occupation as design director required her to perform at the sedentary level. Liberty Life's selective reading of Careau's evaluation is yet another indication of arbitrary and capricious decision-making. *Holmstrom*, 615 F.3d at 777 (finding arbitrary and capricious an insurer's rejection of evidence based on selective readings that are not consistent with "the entire picture"); *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 832-33 (7th Cir. 2009) (denial decision was arbitrary where insurer "cherry-picked the statements from her medical history that supported the decision to terminate her benefits.").

The deficiency of Liberty Life's appeal review is only compounded when one considers its consulting physicians' reports. As indicated earlier, Liberty Life appears to have relied entirely on Dr. Carnow, Dr. Pasquale, and Dr. Willis's record reviews and IME in denying Krupp's appeal. All three physicians, however, failed to consider the effects of Krupp's chronic and debilitating pain on her ability to perform her job.

The Seventh Circuit has held that evidence of subjective pain cannot be

discounted simply because it is "self-serving." *Diaz*, 499 F.3d at 645 (finding claimant's

subjective complaints of pain disabling where corroborated by extensive treatment

including heavy medication and repeated surgical procedures); *Hawkins v. First Union

Corp.*, 326 F.3d 914 (7th Cir. 2003) (complaints of pain cannot be dismissed out of hand

because they are subjective). That said, although "a plan may not deny benefits solely

on the basis that the symptoms of the claimed disability are subjective, a plan may deny

benefits because a claimant has failed properly to document pain-induced functional

limitations." *Majeski*, 590 F.3d at 485. In this case, however, Krupp provided evidence

that she had undergone four back surgeries, received five nerve blocks, and had been

prescribed and taken numerous narcotic pain medications. She also submitted sworn

witness statements prepared by her friends, family, and colleagues attesting to her

changed lifestyle and inability to perform simple tasks due to pain. Liberty Life also had

on file Dr. Nager's assessment, which detailed Krupp's functional limitations, as well as

evidence from nine days of covert video surveillance that confirmed that she was

leading an essentially inactive life. Despite this corroborative evidence and Dr. Nager's

functional limitations assessment, Dr. Carnow stated that "[Krupp's] reports of pain of a

severity to cause impairment [could] not be objectively supported by exam findings or

diagnostic studies," and that there was thus "no medical evidence to support an inability

to work for an eight hour day at the sedentary or light physical demand level." Admin.

R. at LM412. Dr. Pasquale similarly dismissed Krupp's pain, fatigue, and paresthesias

as "subjective" because Krupp could "sit throughout the evaluation, stand and walk

upon entering and leaving the facility," *id.* at LM349, a conclusion that "[fails] to consider

the difference between a person's being able to engage in sporadic activities and her

being able to work eight hours a day five consecutive days of the week." *Diaz*, 499 F.3d at 648 (internal quotation marks omitted). Even Dr. Willis's file review summarily concluded that because "[Krupp's] pain and fatigue are vague," they did not support her diagnoses. Admin. R. at LM126. Because none of Liberty Life's three consulting physicians considered how Krupp's pain might interfere with her ability to perform her job and thus failed to consider a relevant aspect of Krupp's medical condition, Liberty Life's reliance on their opinions was arbitrary.

### b. Social Security disability finding

Krupp argues that Liberty Life arbitrarily failed to take into account the SSA's determination that she was disabled in making its decision to terminate her long-term disability benefits. Although an administrator is not bound by a Social Security determination of disability, an administrator's failure to consider such determination in making its own benefit decisions suggests arbitrary decision making. *Holmstrom*, 615 F.3d at 772-73.

In this case, the SSA determined that Krupp was completely disabled as of November 15, 2008 due to cervical myelopathy, Chiari malformation, autonomic dysfunction, and peripheral neuropathy. The ALJ found that although Krupp was capable of performing light work from time to time, she was nonetheless "unable to sustain such activity, as well as being unable to sustain her attention and concentration for extended periods." Admin. R. at LM84. In making this determination, the law judge relied on not only Krupp's subjective descriptions of her pain and fatigue but also on documented medical evidence of the source of Krupp's pain, her willingness to undergo four surgeries, her record treatment with pain management specialist Dr. Goodman and

treating neurologist Dr. Nager, her need for strong narcotic pain medications, and her "good work history." *Id.* at LM186. The administrative law judge also took into account the diagnosis of Dr. Hakimi – a psychiatrist who evaluated Krupp as part of the Social Security disability claim process – that Krupp suffered from "depression secondary to a chronic condition." *Id.* at LM186.

In its denial of Krupp's appeal, however, Liberty Life did not address any of the ALJ's analysis, instead merely acknowledging the existence of the SSA's determination and summarily dismissing it because the SSA "approves benefits based on their qualifications." *Id.* at LM102. As the Seventh Circuit made clear in *Holmstrom*, a plan administrator cannot simply reject a disability finding by the SSA out of hand but rather must provide a reasoned explanation for why it chose to disregard or discredit that finding. *Id.* at 773 (finding administrator's denial of disability benefits reflected arbitrary and capricious decision-making because it "never stated *why* it disagreed with the Social Security determination") (emphasis added). The Court therefore agrees with Krupp that Liberty Life's inadequate consideration of the SSA's disability determination is a further indication of arbitrary decision making.

### c.  Conflict of interest

As stated above, this Court must consider Liberty Life's conflict of interest in the arbitrary and capricious analysis. A conflict of interest exists where, as in this case, "responsibility for both claim determinations and pay-outs is vested in the same entity." *Leger*, 557 F.3d at 831. The mere existence of a structural conflict, which is "a given in almost all ERISA cases," is not determinative by itself. *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009). Rather, the Court must "consider how heavily [Liberty Life's]

conflict weighs in the [arbitrary and capricious] balance." *Raybourne*, 576 F.3d at 450.

Although a conflict of interest is only a single factor, it will function as a tiebreaker in a

close case "where circumstances suggest a higher likelihood that it affected the benefits

decision." *Glenn*, 554 U.S. at 117.

There are several indicators that Liberty Life's conflict of interest influenced its

decision on Krupp's claim for benefits. First, Liberty Life selectively considered

evidence that supported its decision to terminate benefits. "Selective consideration of

evidence can be a factor suggesting arbitrary administration in its own right, as well as a

reason to give more weight to the conflict factor." *Holmstrom*, 615 F.3d at 777. As

discussed above, Liberty Life's consideration of Krupp's appeal was one-sided. It

denied benefits based almost entirely on the opinions of Dr. Carnow, Dr. Pasquale, and

Dr. Willis. Yet it failed to adequately address contrary evidence, including Krupp's

surgical history, Dr. Nager's opinion as to Krupp's functional limitations, and Careau's

report that Krupp could not return to her position as a design director. Such selective

consideration of the evidence tends to show that a conflict of interest was at work. *See*

*Glenn*, 554 U.S. at 118 (finding a conflict of interest where insurer "emphasized a

certain medical report that favored a denial of benefits [and] de-emphasized certain

other reports that suggested a contrary conclusion.").

Liberty Life's conduct regarding Krupp's Social Security award also indicates that

its conflict of interest affected its decision. The Supreme Court explained in *Glenn* that

courts should give additional weight to a conflict of interest where the administrator

helped a claimant obtain a Social Security disability award and then disregarded the

Social Security disability finding that it had helped procure. *Id.* at 117. In this case,

Liberty Life not only required Krupp to apply for Social Security disability benefits, but it also arranged for legal representation to assist her with appealing the denial of her Social Security disability claim.  Then, after the SSA found Krupp unable to engage in substantial gainful activity and awarded her benefits, Liberty Life relied on that finding to demand reimbursement of benefits that it had paid out to Krupp, while simultaneously ignoring or rejecting the finding in deciding that she no longer qualified for long-term disability benefits.  Under the circumstances, disregarding the Social Security determination without adequate explanation not only suggests procedural unreasonableness, but also "[justifies] the court in giving more weight to the conflict (because [Liberty Life's] seemingly inconsistent positions were both financially advantageous)."  *Id.* at 118.

For these reasons, Liberty Life's conflict would tip the balance in favor of a finding that it acted arbitrarily and capriciously if this were a close case.  The case is not all that close, but the conflict and its impact on Liberty Life's decision making is an additional factor tending to show that it acted arbitrarily.

## II.    Remedy

Krupp asks this Court to award her benefits directly rather than remanding for further proceedings.  "When a plan administrator fails to provide adequate reasoning for its determination, [the] typical remedy is to remand to the plan administrator for further findings or explanations."  *Majeski*, 590 F.3d at 484.  A direct award of benefits is appropriate only in "the rare case where the record . . . contains such powerfully persuasive evidence that the only determination the plan administrator could reasonably make is that the claimant is disabled."  *Id.*

Although Krupp has demonstrated convincingly that Liberty Life acted arbitrarily and capriciously, the evidence in the record is not so "powerfully persuasive" that the only determination the plan administrator reasonably could make is that the claimant is disabled. Accordingly, the Court remands the case to Liberty Life for further proceedings consistent with this decision.

## III.   Attorneys' fees and costs

In her summary briefs, Krupp requests an award of attorneys' fees and costs under ERISA § 1132(g)(1), which provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." This request is premature. The appropriate time for attorney's fees is after entry of judgment. If Krupp believes a fee award is appropriate, she should file the necessary motion within the appropriate time after entry of judgment.

## Conclusion

For the foregoing reasons, the Court grants plaintiff's motion for summary judgment [docket no. 38] and denies defendant's motion for summary judgment. Plaintiff's motion to file a paper copy for the claim file is terminated as moot [docket no. 42]. The Clerk is directed to enter judgment vacating the decision of the plan administrator and remanding the case to the administrator for further proceedings consistent with the Court's decision.

MATTHEW F. KENNELLY
United States District Judge

Date:  March 25, 2013